■ In the Matter of TERRELL WILLIAMS, Appellant, v CITY OF NEW YORK et al., Respondents. [38 NYS3d 528]—

Order and judgment (one paper), Supreme Court, New York County (Frank P. Nervo, J.), entered August 12, 2014, denying the petition to vacate the part of the arbitration award that terminated petitioner's employment as a tenured school teacher, and dismissing the proceeding, reversed, on the law, without costs, the petition granted, and the matter remanded to respondents for imposition of a lesser penalty.

The evidence presented at the arbitration hearing establishes that petitioner, while an eighth-grade physical education teacher, initiated conversations with at least two of his female students asking them if they had older sisters, and, if so, how old they were, whether they had boyfriends, and whether they had photographs of them,[1] and accepted the phone number of one student's 23-year-old sister. Petitioner also told a student that her mother had called him "handsome" while passing him

1. The dissent claims that petitioner "ogle[d]" photographs of his student's sisters. However, there is no support in the record for this claim, and the Hearing Officer did not so find.

on the street. One student testified that petitioner's conduct made her feel "uncomfortable," and another said that his conduct "aggravated" her. Of the 12 specifications with which he was charged, the Hearing Officer dismissed five, including charges that he had engaged in similar behaviors in the 2010-2011 school year, that he actually contacted the sister whose telephone number he received, and that he told the students, "[M]y wife said I can look but I can't touch."[2]

The Hearing Officer found petitioner to be insufficiently remorseful, that his actions revealed "moral failings," and that, although termination might be "too severe," it was the only penalty that could "jolt" petitioner into an understanding of the seriousness of his misconduct.

Based on all the circumstances of the case, including the lack of any prior allegations of misconduct against petitioner during 13 years of service and the fact that the misconduct does not violate any specific rule or regulation, we find the penalty of termination sufficiently disproportionate to the offenses to shock the conscience (*see Lackow v Department of Educ. [or "Board"] of City of N.Y.*, 51 AD3d 563, 569 [1st Dept 2008]).

Moreover, petitioner had never been warned or reprimanded regarding the conduct at issue, and, contrary to the conclusion of the Hearing Officer, there is no evidence that a warning or reprimand or other penalty short of termination would not have caused petitioner to cease the objectionable conduct immediately (*see Matter of Polayes v City of New York*, 118 AD3d 425 [1st Dept 2014]).

While we share some of our dissenting colleague's concern regarding petitioner's behavior and his failure to express any deeper understanding of the inappropriate nature of his actions, we do not agree that the law supports petitioner's termination at this time. This is in part because we do not agree that petitioner's communication with his students, while inappropriate, can be fairly characterized as "romantic/sexual in nature," or as being for the purpose of "solicit[ing] female companions for his sexual gratification," as the dissent puts it. The Hearing Officer herself found only that petitioner made "inappropriate inquiries of his 8th grade female students regarding their female relatives, in furtherance of a personal agenda having nothing to do with school or his responsibilities as a teacher." She did not find that petitioner actually intended

---

2. The dissent claims that petitioner sent a text to the student's sister. However, there was no proof that he did so, as the hearing officer specifically found, and that specification was dismissed.

to, or did, have any "romantic/sexual" interactions with anyone. Rather, she concluded that petitioner's questions about the students' sisters "in sum and substance . . . amount[ ] to expressing an interest in meeting" their sisters, and she made clear that no one testified to his using "those precise words." There is no evidence that he made any sexual comments to his students.

In contrast, the teachers in each of the cases cited by the dissent engaged in conduct that constituted a violation of a specific law, rule or regulation, and that was far more outrageous than petitioner's in this case. In *Matter of Villada v City of New York* (126 AD3d 598 [1st Dept 2015]), Mr. Villada repeatedly sexually harassed a colleague, including by forcibly tongue kissing her. In *Matter of Ajeleye v New York City Dept. of Educ.* (112 AD3d 425 [1st Dept 2013]), Mr. Ajeleye was found guilty of verbal abuse of students, insubordination, neglect of duty, and unbecoming conduct. The teacher in *Matter of Binghamton City School Dist. (Peacock)* (33 AD3d 1074, 1077 [3d Dept 2006], *appeal dismissed* 8 NY2d 840 [2007]) was found to have committed insubordination, neglect of duty and conduct unbecoming a teacher because he had "engaged in an improper, intimate and clandestine relationship with a minor female student . . . [for which he] showed no remorse . . . , disobeyed administrative direction to cease his relationship with the student and not transport her in his car, and continued to contact her even after disciplinary charges were brought against him." The teacher in *Lackow* (51 AD3d at 565) discussed bestiality, necrophelia and his own ejaculations with students, and, while teaching class with a model of reproductive organs, told a student he should "enjoy" looking at a vagina. Moreover, Mr. Lackow had received at least three written warnings to stop such conduct. His termination was the result of his failure to do so (51 AD3d at 568-569). Similarly, the teacher in *Matter of Rogers v Sherburne-Earlville Cent. School Dist.* (17 AD3d 823, 824-825 [3d Dept 2005]) had received warnings before being terminated for falsifying time records, abusing leave time by, for example, using sick leave to go hunting, and taking excessive leave time. The dissent also cites *Matter of Chaplin v New York City Dept. of Educ.* (48 AD3d 226, 227 [1st Dept 2008]) for the proposition that even employees with good work histories are appropriately terminated for "[a]cts of moral turpitude." That case does not discuss the specific behavior which triggered the employee's termination. However, in both *Chaplin* and the Court of Appeals case to which it cites, *Matter of Kelly v Safir* (96 NY2d 32, 37, 39 [2001]), the petitioners' acts constituted crimes, which is certainly not the case here.

Here, petitioner showed very poor judgment, but he has not been shown to have violated any law, or even any rule or regulation of the Department of Education. Our decision today does not excuse petitioner's behavior, but directs a less serious punishment. Should it continue, termination may well be in order in the future. Concur—Acosta, Richter, Manzanet-Daniels and Gesmer, JJ.

Tom, J., dissents in a memorandum as follows: In this CPLR article 75 proceeding, petitioner seeks to vacate the arbitration award of a Hearing Officer, dated October 29, 2013, which terminated his employment as a tenured physical education and health teacher. Due to the egregious nature of the misconduct at issue, and the Hearing Officer's conclusion that petitioner did not display any remorse or an appreciation for the seriousness of his actions or the effect his actions had on the young female students, I would find that the penalty of termination was appropriate (*see Matter of Villada v City of New York*, 126 AD3d 598 [1st Dept 2015]; *Lackow v Department of Educ. [or "Board"] of City of N.Y.*, 51 AD3d 563 [1st Dept 2008]).

The evidence presented at the arbitration hearing establishes that petitioner, while an eighth-grade physical education teacher, repeatedly engaged in inappropriate conversations with his female students. Specifically, these conversations were romantic/sexual in nature and involved petitioner asking multiple female students in 7th and 8th grade about their older sisters and female relatives, including what their sisters, mothers and aunts looked like, whether they had boyfriends, and soliciting contact information and photographs for his own personal gratification and use. Five former female students testified at the hearing that during the downtime before physical education class started or during girls' volleyball practice in the mornings, petitioner asked on multiple occasions whether they had older sisters, how old they were, what they looked like, and whether he could have their phone number. Some of these conversations took place when the girls' volleyball team was formed for practice in the morning before school began. Although respondent was not one of the coaches for the volleyball team, he would arrive early to school to join the girls' practice. It was in these various settings that conversations which formed the basis of the charges against respondent took place. In one instance petitioner learned that the student had a 23-year-old sister, he asked more than once, and finally obtained the number. The students testified that petitioner's conduct made them feel "uncomfortable" and "aggravated." In

addition, one of the student's mothers had come to the school upset and filed a complaint after learning petitioner had asked her daughter if she had any cute sisters and later was told by the student's older sister that petitioner had "texted" her phone. This was the testimony of one of the students.

These inappropriate conversations with different female students spanned the 2010-2011 and 2011-2012 school years, and, by petitioners's own admission, he had at least 20 such conversations in the 2011-2012 school year.[1] Petitioner also testified that he had engaged in these types of conversations several times before, including at another school.

According to petitioner, all of the inappropriate conversations were initiated by the students who would frequently talk about their female relatives and try to interest him by showing him pictures or offering phone numbers. He similarly claimed that parents would approach him directly and ask him to go out for a drink or "hang out." He claimed that his questions about student's sisters were made "jokingly," and that he would brush off students' entreaties about their female relatives by smiling and sometimes saying, "I love my wife." Petitioner also explained that he did not tell his students to stop these conversations— even though he thought the students were serious when they made the comments— because at his prior school, where the same situation had occurred, he told a student to stop and got a bad reaction from the student, who became angry at the suggestion that petitioner thought he was too good for her mother.

The Hearing Officer sustained the majority of the charges against petitioner and made clear that the case turned on the credibility of the witnesses. In particular, the Hearing Officer found petitioner's claims incredible and rejected his version of events while crediting the testimony of the students. The Hearing Officer did not believe that five eighth-grade students would conspire to lie under oath about their former teacher, and found no evidence to support such a conspiracy. In this regard, the Hearing Officer could not accept petitioner's claims that the students instigated these conversations or actively solicited their own family members into a relationship with a married man. Nor did she credit petitioner's testimony that during different years and at different schools eighth-grade students could not contain themselves in trying to bring petitioner into

---

1. Although the Hearing Officer dismissed the charges relating to the 2010-2011 school year, she did not find the testimony relating to those charges to be unreliable and, in fact, took into account that the record supported that petitioner made certain comments in that school year.

their families in a romantic way or that parents were throwing themselves at petitioner. The Hearing Officer also rejected any contention that these conversations were made entirely in jest.

In sustaining the various charges, the Hearing Officer stressed that the behavior at issue was not isolated and included numerous conversations with multiple female students at this school (and at a prior school) during which he discussed their relatives' phone numbers and viewed their photographs. She also remarked that petitioner had attempted to paint himself as a victim who could not "contain a constant onslaught of female attention, even when it involves his students."

The Hearing Officer ultimately found that termination was the appropriate penalty because petitioner did not understand the seriousness of his conduct, continued to deny wrongdoing and place blame on his young students, and "did not consider the possibility, even in his version of this story, that the appropriate response is to address his students with discipline and/or moral teaching." The Hearing Officer went on to note that "[c]ontrary to his own misguided understanding, [petitioner] *is* a role model for his students, and he is expected to model appropriate behavior." Further, she did not believe a fine or suspension would make him understand the seriousness of his behavior or "right the moral judgment which is so horribly askew." Nor did she think a lesser penalty would be appropriate because she did not "believe such a penalty would be effective, . . . nor adequately address[ ] the harm done here."

Petitioner continues to minimize his conduct in this proceeding, referring to it as "harmless banter" and claiming it to be a "minor lapse in judgment" unlikely to recur despite his own admissions that he spoke to numerous students this way at two different schools over different years. In sum, he insists that his behavior had no "ill effects" on the students at issue.

Petitioner's continued failure to comprehend the nature and seriousness of his actions, blaming the young students for his misconduct and showing no remorse for his actions, supports the Hearing Officer's point and her conclusion that the penalty of termination was appropriate. Initially, petitioner's lack of prior disciplinary history was considered by the Hearing Officer and is no basis to reduce the penalty (*see Matter of Ajeleye v New York City Dept. of Educ.*, 112 AD3d 425, 426 [1st Dept 2013]). In any event, the record shows petitioner received an unsatisfactory rating for the school year previous to those at issue, and the absence of prior charges does not necessarily prove his behavior was beyond reproach.

Nor is even worse behavior such as physical assault a prerequisite to termination (*see e.g. Lackow*, 51 AD3d at 569 [continuing in a pattern of conduct that was clearly irresponsible and inappropriate within the classroom setting]; *Ajeleye*, 112 AD3d at 425 [insubordination, neglect of duty, conduct unbecoming his position, and using language that constituted verbal abuse of his students]). Termination for offenses has been found appropriate where, as here, a teacher has displayed no remorse or an appreciation for the seriousness of his actions (*see Villada*, 126 AD3d at 599). Termination of a teacher who merely engaged in a pattern of excessive leave time usage has been upheld as not shocking to the conscience (*Matter of Rogers v Sherburne-Earlville Cent. School Dist.*, 17 AD3d 823 [3d Dept 2005]). Moreover, we have held that "[a]cts of moral turpitude committed in the course of public employment are an appropriate ground for termination of even longstanding employees with good work histories" (*Matter of Chaplin v New York City Dept. of Educ.*, 48 AD3d 226, 227 [1st Dept 2008]).

The majority's efforts to distinguish the foregoing cases do not support a finding that the penalty in this case shocks the conscience. While the actions in those cases were egregious, they do not make petitioner's behavior appropriate or acceptable or somehow make him fit to remain a teacher. Further, the purpose of citing a case such as *Lackow* was not because the facts are identical but rather to demonstrate that neither physical abuse nor sexual assault are the standard required for a teacher to be terminated, and because the teacher in *Lackow* similarly "continued in a pattern of conduct that was clearly irresponsible and inappropriate within the classroom setting" which "reflect[ed] an inability to understand the necessary separation between a teacher and his students" (51 AD3d at 569).

The majority also notes that petitioner's misconduct does not violate any specific rule or regulation. However, the Education Law has a general prohibition on "conduct unbecoming a teacher" (*see Matter of Denhoff v Mamaroneck Union Free School Dist.*, 29 Misc 3d 1207[A], 2010 NY Slip Op 51742[U] [Sup Ct, Westchester County 2010], *affd* 101 AD3d 997 [2d Dept 2012]; *see also Matter of Douglas v New York City Bd. / Dept. of Educ.*, 87 AD3d 856 [1st Dept 2011] [upholding penalty of termination where the petitioner was charged with conduct unbecoming a teacher]; *Matter of Mazur [Genesee Val. BOCES]*, 34 AD3d 1240 [4th Dept 2006] [upholding penalty of termination where evidence, inter alia, supported the Hearing Officer's

determination that the petitioner engaged in conduct that was unbecoming an administrator]). There is no question that the evidence in this case established that petitioner engaged in conduct that was unbecoming a teacher.

*Matter of Polayes v City of New York* (118 AD3d 425 [1st Dept 2014]) bears no relation to this case. In *Polayes,* the teacher engaged in one objectively innocuous conversation with a group of high school senior students during which he suggested one student was "the type to party with" or "you want to go to school to party" after that student expressed interest in attending a college that was widely reported to be a "party school." The students who testified were not offended by these comments. In contrast, petitioner, during the course of different school years and at different schools, engaged in numerous inappropriate romantic/sexual in nature conversations with multiple young female students during which he discussed his potential romantic interest and possibly to form an intimate relationship with his students' female relatives who he objectified.

The evidence in this case clearly showed that petitioner fails to understand the seriousness of his actions, that he was a role model for his students, and that his conduct undoubtedly had ill effects on his students and made him unworthy of a position of trust and authority over impressionable students. Rather than providing his students moral guidance about boundaries and appropriate conversations to have with teachers or modeling correct behavior for them, petitioner illustrated for them repeatedly that he finds it acceptable to discuss his potential romantic or sexual interest in any and all of their female relatives, to ogle over photographs of those relatives, and to view them as appropriate targets for conquest.[2] What, indeed, does this teach adolescent girls about their worth in the world? Petitioner's conduct is demeaning to women. It can only serve to reinforce a wrongheaded sense that their value is solely in their physical appearance and as objects of desire, that their older female relatives, and soon they, will be objects pursued even by those who are in positions of authority over them, who

---

2. The majority notes that the Hearing Officer did not specifically determine whether petitioner "ogled" photographs of his students' female relatives. On the other hand, she did not determine he had not done so. In any event, one would be hard pressed to find a more appropriate word for petitioner repeatedly asking his students what their sisters, mothers and aunts looked like, and then soliciting and viewing their photographs for his own personal gratification. Indeed, when asked how many students had presented him with photographs, petitioner responded he would have to "sift through" the photographs he received.

are tasked with molding them from children into adults. Moreover, the fact that petitioner, an authoritative figure and supposed role model, is openly a married man with children seeking out young female companions can give the wrong impression to the female students that spousal cheating is proper and acceptable.

Although he refuses to acknowledge his responsibility to his students, his duties included supplying a safe learning environment and fostering trust and respect in authority figures. Instead, by repeatedly engaging in inappropriate romantic/sexual conversations, petitioner horribly miseducated his young students about student-teacher boundaries, proper and decent behavior, good moral conduct and about how they should view themselves and their female relatives. Petitioner has irreversibly abused his position as a teacher by transforming the high school where he teaches into a dating forum using his young female students to search out candidates for his illicit romantic escapades. This behavior harmed his students, even if they did not fully realize it.

Accordingly, petitioner's conduct over years involving multiple students and schools, and his continued failure to show remorse or understanding of either his actions or responsibility as a teacher, demonstrates that he is not fit to be a teacher, and thus the penalty of termination does not shock the conscience.

Notably, in *City School Dist. of the City of N.Y. v McGraham* (17 NY3d 917, 919 [2011] [internal quotation marks omitted]), the Court of Appeals cautioned that "[c]ourts will only intervene in the arbitration process in those cases in which public policy considerations, embodied in statute or decisional law, prohibit, in an absolute sense, particular matters being decided or certain relief being granted by an arbitrator." Thus, as the Court emphasized, "That reasonable minds might disagree over what the proper penalty should have been does not provide a basis for vacating the arbitral award or refashioning the penalty" (*id.* at 920). Here, too, that the majority might have issued a lesser penalty had they been in the position of the Hearing Officer, does not provide a basis for vacating the arbitral award.

Oddly, the majority does not agree with my characterization of petitioner's communications as "romantic/sexual in nature" or for being for the purpose of "soliciting female companions for his sexual gratification." Yet, the Hearing Officer specifically stated that the "conversations generally involved whether [petitioner] might have a romantic interest in some of the

students' older female relatives." The testimony of multiple students included examples of petitioner asking them about what their relatives looked like, whether they were cute, whether those relatives were in a relationship, and whether he could see photographs of them and be given their phone numbers. Surely, petitioner was not seeking intellectual stimuli from these potentially young, "cute" companions. As succinctly stated by the Hearing Officer, a "test of common sense" can only lead to a conclusion that petitioner intended to form a romantic and possibly an intimate relationship with his young students' older siblings. As further stated by the Hearing Officer, "I am urged not to throw common sense out the window."

Petitioner's testimony also made clear that these were romantic conversations. His own testimony was that his students solicited his romantic interest in their relatives to, as the Hearing Officer put it, bring him "into their families in a romantic way" and that parents "threw themselves at him."

The Hearing Officer, whose credibility and factual findings are entitled to deference (see Matter of Berenhaus v Ward, 70 NY2d 436, 443 [1987]), ultimately determined that petitioner initiated conversations with students about their female relatives for "inappropriate, personal purposes." Given the foregoing testimony and findings it is astounding that the majority would conclude that petitioner's communications with his students were not found to be romantic/sexual in nature. What other purpose petitioner could have had in seeking photographs and phone numbers of students' young female relatives, while also querying if they were in a relationship, is truly a mystery.

The majority urges that "petitioner had never been warned or reprimanded regarding the conduct at issue" and that "a warning" could cause petitioner to cease the conduct. The majority's position is irrational in that a high school teacher should not even have to be warned not to use his students to solicit female companions for his sexual gratification. It is also wishful thinking that petitioner can right his moral shortcomings with a warning. The majority should recognize that petitioner has solicited female companions at work on multiple occasions at different school years and at different schools, and this is not an isolated incident. In any event, the disciplinary process does not require waiting until worse harm befalls a student at the hands of a teacher.

Further, the fact that petitioner had not received prior warnings about his behavior is no basis for vacating the penalty. Indeed, "no reasonable person concerned about education— could plausibly believe that the conduct in which [petitioner]

was found to have engaged was not unbecoming of a teacher and subversive of the educational process" (*Denhoff*, 2010 NY Slip Op 51742[U], *10). Stated another way, "It is incredible that any adult—let alone a teacher—would not know that the conduct is and was improper" (*Nreu v New York City Dept. of Educ.*, 25 Misc 3d 1209[A], 2009 NY Slip Op 52007[U], *5 [Sup Ct, NY County 2009]).

Given New York's "explicit and compelling public policy to protect children from the harmful conduct of adults" (*Matter of Binghamton City School Dist. [Peacock]*, 33 AD3d 1074, 1076 [3d Dept 2006], *appeal dismissed* 8 NY3d 840 [2007]), the Hearing Officer rationally concluded that petitioner, who was placed in a position of authority over children, betrayed that trust and his responsibility and posed a continued danger to those students because he failed to understand appropriate boundaries or his role in educating his students, that the evidence supported a finding that he would engage in similar behavior again and that termination was appropriate.

For these reasons, I would affirm Supreme Court's order denying the petition to vacate the arbitration award and dismissing the proceeding.