MEMORANDUM:
In Matter of Bolt v. New York City Dept. of Education and Matter of Beatty v. City of New York, the order of the Appellate Division should be reversed, with costs, respondents' cross motion to dismiss the petition granted, and the certified question answered in the negative; in Matter of Williams v. City of New York, the arbitral award appealed from and the Appellate Division order brought up for review should be reversed, with costs, and the judgment of Supreme Court, New York County, dismissing the proceeding reinstated.
"That reasonable minds might disagree over what the proper penalty should have been does not provide a basis for vacating the arbitral award or refashioning the penalty" ( City School Dist. of the City of N.Y. v. McGraham, 17 NY3d 917, 920, 934 N.Y.S.2d 768, 958 N.E.2d 897 [2011] ). Here, the penalties imposed are not irrational and do not shock the conscience (see Matter of Russo v. New York City Dept. of Educ., 25 NY3d 946, 948, 29 N.E.3d 896 [2015], cert denied 577 U.S. ----, 136 S.Ct. 416, 193 L.Ed.2d 317 [2015] ; Matter of Kelly v. Safir, 96 N.Y.2d 32, 38, 724 N.Y.S.2d 680, 747 N.E.2d 1280 [2001] ; Matter of Featherstone v. Franco, 95 N.Y.2d 550, 554, 720 N.Y.S.2d 93, 742 N.E.2d 607 [2000] ; Matter of *1236 **257 Pell v. Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 N.Y.2d 222, 233, 356 N.Y.S.2d 833, 313 N.E.2d 321 [1974] ). The Appellate Division exceeded its authority by reweighing the evidence and substituting its judgment for that of the hearing officer.
RIVERA, J. (concurring):
I agree with my colleagues that the Appellate Division orders should be reversed because in all three appeals the court exceeded its authority and substituted its own judgment for that of the hearing officer (majority op. at 1068, 69 N.Y.S.3d at 256-57, 91 N.E.3d at 1235-36 ). There is no dispute that these appeals require the application of settled law to the facts of each case. There is no doctrinal complexity or novel issue presented in these appeals that cannot be resolved by reference to existing precedent. The Court is unanimous in its conclusion that under our well-established standards, the administrative sanctions are not irrational and do not "shock the conscience," and therefore the court may not disturb the penalties imposed (see Matter of Pell v. Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 N.Y.2d 222, 240, 356 N.Y.S.2d 833, 313 N.E.2d 321 [1974] ).
Under other circumstances I would have no cause to write separately. Certainly, there is an argument to be made that brevity of analysis coupled with a solid reversal is sufficient ***1069 comment on an obvious misapplication of the law. Nevertheless, because the Appellate Division analyses in these appeals are so clearly at odds with uncontroversial, established legal standards, and because respondent Department of Education compellingly argues this Court should clarify the scope of review to avoid judicial overreach in school disciplinary cases, it appears that full articulation of applicable standards is in order. Rearticulating our jurisprudence should eliminate any possible misunderstanding as to the Appellate Division's review of administrative sanctions, and reaffirm the high degree of impropriety and affront to our sense of fairness required to "shock the conscience."
I. JUDICIAL REVIEW OF ADMINISTRATIVE SANCTIONS
Judicial review of an administrative disciplinary determination is statutorily and constitutionally defined (see CPLR 7803, 7511 ; NY Const, art VI, § 3 ). We have repeatedly explained in article 78 proceedings that contrary to the Appellate Division's general broad jurisdiction, its review of administrative sanctions is circumscribed and no greater than our own. Thus, "the Appellate Division lacks any discretionary authority or interest of justice jurisdiction in reviewing the penalty imposed" by an administrative entity (Matter of Featherstone v. Franco, 95 N.Y.2d 550, 554, 720 N.Y.S.2d 93, 742 N.E.2d 607 [2000] ). Instead, like this Court, the Appellate Division's "review of an administrative penalty is limited to whether the measure or mode of penalty or discipline imposed constitutes an abuse of discretion as a matter of law" (Matter of Kelly v. Safir, 96 N.Y.2d 32, 38, 724 N.Y.S.2d 680, 747 N.E.2d 1280 [2001] ; Featherstone, 95 N.Y.2d at 554, 720 N.Y.S.2d 93, 742 N.E.2d 607 ; CPLR 7803[3] ). Further, " Education Law § 3020-a (5) limits judicial review of a hearing officer's determination to the grounds set forth in CPLR 7511," and "[w]here, as here, parties are subject to compulsory arbitration, the award ... 'must have evidentiary support and cannot be arbitrary and capricious' " ( City Sch. Dist. of City of New York v. McGraham, 17 NY3d 917, 919, 934 N.Y.S.2d 768, 958 N.E.2d 897 [2011] [citation omitted] ). Significantly, an award is not arbitrary and *1237 **258 capricious or irrational simply because there are differing views as to the appropriate sanction. "That reasonable minds might disagree over what the proper penalty should have been does not provide a basis for vacating the arbitral award or refashioning the penalty" (id. at 920, 934 N.Y.S.2d 768, 958 N.E.2d 897).
Against this backdrop, the Court and the Appellate Division have uniformly reviewed administrative penalties under the standard set forth in Pell, which provides that "[u]nless an irrationality ***1070 appears or the punishment shocks one's conscience, sanctions imposed by an administrative agency should be upheld" ( Pell, 34 N.Y.2d at 240, 356 N.Y.S.2d 833, 313 N.E.2d 321 ). The Court has characterized the standard as "rigorous" ( Featherstone, 95 N.Y.2d at 554, 720 N.Y.S.2d 93, 742 N.E.2d 607 ). "[T]he test is whether such punishment is so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness" (id. at 233, 356 N.Y.S.2d 833, 313 N.E.2d 321 [internal quotation marks omitted] ). This "calculus involves consideration of whether the impact of the penalty on the individual is so severe that it is disproportionate to the misconduct, or to the harm to the agency or the public in general" ( Kelly, 96 N.Y.2d at 38, 724 N.Y.S.2d 680, 747 N.E.2d 1280 ).
The phrase "shocking to one's sense of fairness," must by its nature "reflect [ ] a purely subjective response to the situation presented" ( Pell, 34 N.Y.2d at 234, 356 N.Y.S.2d 833, 313 N.E.2d 321 ). While "such language reflects difficulty in articulating an objective standard ..., by the impact of sufficient instances, a more analytical and articulated standard evolves" (id. ). In light of this developing standard, the Court has adopted normative measures to guide judicial review in determining whether a sanction is an affront to our sense of fairness. At a minimum:
"a result is shocking to one's sense of fairness if the sanction imposed is so grave in its impact on the individual subjected to it that it is disproportionate to the misconduct, incompetence, failure or turpitude of the individual, or to the harm or risk of harm to the agency or institution, or to the public generally visited or threatened by the derelictions of the individuals. Additional factors would be the prospect of deterrence of the individual or of others in like situations, and therefore a reasonable prospect of recurrence of derelictions by the individual or persons similarly employed. There is also the element that the sanctions reflect the standards of society to be applied to the offense involved. Thus, for a single illustrative contrast, habitual lateness or carelessness, resulting in substantial monetary loss, by a lesser employee, will not be as seriously treated as an offense as morally grave as larceny, bribery, sabotage, and the like, although only small sums of money may be involved" (id. at 234-235, 356 N.Y.S.2d 833, 313 N.E.2d 321).
This Court's recognition of societal standards as a factor in determining whether a sanction exceeds the bounds of acceptable punishment for misconduct in the administrative context ***1071 should not be misread. It was never meant as an invitation to a reviewing court to supplant the hearing officer's determination as to the sanction appropriate to the misconduct based on the factual record and considered in light of the duties charged to the agency and its administrative goals (id. at 232, 356 N.Y.S.2d 833, 313 N.E.2d 321, citing Matter of Diocese of Rochester v. Planning Bd. of Town of Brighton, 1 N.Y.2d 508, 520, 154 N.Y.S.2d 849, 136 N.E.2d 827 [1956] ). *1238 **259 Thus, under Pell, the mere fact that a penalty is harsh, and imposes severe consequences on an individual, does not so affront our sense of fairness that it shocks the conscience, unless it is obviously disproportionate to the misconduct and in contravention of the public interest and policy reflected by the agency's mission. For example, in Matter of Ward v. City of New York ( 23 NY3d 1046, 992 N.Y.S.2d 781, 16 N.E.3d 1261 [2014] ), this Court held that the revocation of petitioner's master plumbing license, upon a finding that she violated the New York City Building Code in supervising a worker outside of her employ or direct supervision for a portion of a project, did not shock the conscience, despite the license being her sole means of livelihood, her unblemished record for a decade, a lack of harm to the public or any agency, and her acknowledgment of the potential for harm when she notified the owner that the worker's performance was inadequate and proposed her team fix the violation. Similarly, in Matter of Lozinak v. Bd. of Educ. of Williamsville Cent. Sch. ( 24 NY3d 1048, 1049, 998 N.Y.S.2d 753, 23 N.E.3d 1021 [2014] ), this Court reversed the Appellate Division, and held that the termination of a school administrative officer who used interoffice mail to send prescription pills left over from her knee surgery to another school employee with shoulder pain did not shock the conscience, despite the officer's 26 years of unblemished service and positive performance evaluations. In contrast, this Court concluded in Matter of Principe v. New York City Dept. of Educ. ( 20 NY3d 963, 958 N.Y.S.2d 325, 982 N.E.2d 88 [2012] ) that dismissal was an excessive penalty that shocked the conscience where the hearing officer had an apparent bias against the teacher and failed to consider the teacher's testimony and unblemished record, and the teacher was responding to threatening situations without premeditation in order to protect other students and faculty members while acting within his role as dean of discipline, a role to which he had recently been promoted. As these cases illustrate, the court's review is limited to considering the proportionality of the sanction to the individual's misconduct, including the potential impact on the agency and its interest in deterrence, and ***1072 whether the sanction appears to minimize or trivialize the individual's conduct.
"Moreover, in every case there must be sensitive distinction among agencies based upon their responsibilities to the public" ( Pell, 34 N.Y.2d at 241, 356 N.Y.S.2d 833, 313 N.E.2d 321 ). That directive is of particular relevance to these appeals, because the Department of Education (DOE) operates the nation's largest public school system and is entrusted with the education of over one million children. DOE's professional teaching staff is primarily responsible for preparing their students for "meaningful civic participation in contemporary society" ( Campaign for Fiscal Equity, Inc. v. State, 100 N.Y.2d 893, 905, 769 N.Y.S.2d 106, 801 N.E.2d 326 [2003] ), and these educators serve as role models and mentors. Certainly, public education is a matter of significant public interest, and those charged with preparing future generations are accorded appropriate deference to their expertise and assessment of how best to address misconduct affecting DOE's educational mission and core principles ( Matter of Harris v. Mechanicville Cent. School Dist., 45 NY2D 279, 285, 408 N.Y.S.2d 384, 380 N.E.2d 213 [1978] ). In fact, the Court has been reticent to opine on the precise sanction appropriate for misconduct in "matter[s] involving both internal discipline and an understandable concern for the reactions of parents in the school district, areas in which the board [of education] possesses special sensitivity" (id. ). Indeed, as the Court has acknowledged *1239 **260 with respect to administrative sanctions, "it is the agency and not the courts which, before the public, must justify the integrity and efficiency of their operations" ( Pell, 34 N.Y.2d at 235, 356 N.Y.S.2d 833, 313 N.E.2d 321 ).
Applying these legal principles to the three appeals at issue here, and with a full appreciation of the narrow confines of judicial review of administrative penalties, it is abundantly clear that the sanctions awarded in each case are not irrational and do not shock the conscience. To the contrary, the penalties further DOE's mission, discourage similarly egregious behavior in the future, and are well suited to mitigate the impact of petitioners' respective misconduct on their students' personal development, as well as on the integrity of the public education system.
II.
In these three appeals, petitioners were afforded hearings before an arbitrator, in accordance with Education Law § 3020-a. In each case, the arbitrator determined that the evidence sufficiently established misconduct that warranted ***1073 termination of the petitioner's employment. Each petitioner commenced a CPLR article 75 proceeding challenging the award with varying levels of success in Supreme Court. On appeal to the Appellate Division, a divided court in each case determined that the administrative sanction "shocked the conscience" and remanded to DOE for imposition of a lesser penalty.
As is plain from the majority analyses of the record, the Appellate Division exceeded the bounds of its review power, ignored the arbitrators' credibility findings and substituted its judgment for that of DOE. The courts improperly concluded that the penalties were disproportionate to the misconduct and petitioners' employment histories tipped in favor of a penalty short of termination.
A. Matter of Bolt v. New York City Dept. of Education
Petitioner Ericka Bolt was a fifth-grade teacher alleged to have improperly directed students to cheat while proctoring statewide examinations. The arbitrator found sufficient evidence, which included testimony from several of petitioner's students and the principal, that petitioner improperly assisted students during the administration of the statewide English Language Arts examination, violated the school's protocol for statewide testing, was insubordinate for failing to comply with testing protocol, and caused an inaccurate measurement of student performance. The arbitrator deemed dismissal warranted based on this gross misconduct and neglect of duty, as well as petitioner's failure to serve as a positive role model for students.
Petitioner challenged the determination, arguing that the arbitrator had exceeded his power, his decision was irrational, and the penalty was excessive. Supreme Court vacated the award in its entirety, finding the decision irrational and termination of petitioner's employment "disproportionate and excessive." ( Matter of Bolt v. New York City Dept. of Educ. , 2015 NY Slip Op 30683[U], *9, 2015 WL 1938758 [Sup.Ct., NY County 2015] ).
The Appellate Division, with one justice dissenting, modified the judgment on the law to confirm the arbitrator's finding of guilt and remanded the matter to DOE to impose a lesser penalty (Matter of Bolt v. New York City Dept. of Educ., 145 AD3d 450 [1st Dept 2016] ). The court held that termination of employment as a penalty in petitioner's case shocked one's sense of fairness because she was a tenured teacher with an unblemished 11-year record, *1240 **261 whose behavior, while wrong, demonstrated ***1074 a one-time lapse in judgment, and no evidence suggested she could not remedy her behavior (see id. at 450-451).
Contrary to the Appellate Division's conclusion, which failed to properly consider the severity of the misconduct, there is nothing shocking to the conscience about imposing termination as a penalty on a teacher who encourages her students to cheat on statewide examinations. To the extent the court suggests, as petitioner maintains on this appeal, that termination of an employee with an unblemished history is per se shocking to the judicial conscience, the court misapplies the "rigorous Pell standard" ( Featherstone, 95 N.Y.2d at 554, 720 N.Y.S.2d 93, 742 N.E.2d 607 ). As Pell and its progeny make clear, whether an administrative penalty is so excessive as to affront one's sense of fairness depends on "all of the circumstances" of the individual case (id. at 555, 720 N.Y.S.2d 93, 742 N.E.2d 607).
Here, petitioner helped children cheat on a statewide examination. She set a terrible example for her impressionable students, for whom she served as both a role model and authority figure. Her behavior undermined and skewed the results of the examination for her students and other students in her school and throughout the state. Her students clearly did not realize that being told by a teacher to fix their answers on an examination was wrong, as demonstrated by their request for similar help from their subsequent teacher. The revelation of such misconduct serves to cast aspersions on the ethics of the teaching profession and on the accuracy of statewide examinations and grading in general. Given the seriousness of petitioner's conduct, its adverse impact on the children's education and development, and the potential of a lesser penalty to encourage similar future misconduct by teaching staff, undermining the integrity of statewide measures of student progress and the public education system, the Appellate Division erroneously concluded that petitioner's dismissal shocked the conscience.
B. Matter of Beatty v. City of New York
Petitioner Amira Beatty worked as a special education teacher in DOE's Home Instruction Program for 13 years. The program provides both short- and long-term teachers for students who are unable to receive instruction in a traditional classroom setting due to medical or psychiatric reasons. Teachers in the program work "in the field," are largely unsupervised and work on the honor system, as they create schedules with each individual student and then apprise their supervisors of their schedules and any changes. The teachers are responsible for maintaining accurate employment records and submit daily ***1075 logs reflecting instructional activities as well as monthly time sheets accounting for their work.
One of petitioner's students had cerebral palsy and entered the Home Instruction Program following major surgery. Petitioner began providing the student instruction at the student's home, but following Hurricane Sandy, which greatly affected the Rockaways where the student lived, petitioner failed to meet with the student for two months without informing her supervisor-all the while submitting daily logs and time sheets in which she certified they were continuing to meet. The Special Commissioner for Investigation found that petitioner had not met with the student on 24 occasions despite petitioner's contrary certifications. Petitioner admitted that she did not provide services to the student after the hurricane and that she submitted false daily logs and time sheets.
*1241 **262 Based on the evidence adduced at the hearing, the arbitrator found petitioner's dismissal was warranted. Significantly, the arbitrator credited the student's mother's testimony over petitioner's contradictory assertion that the mother asked her not to transfer the child to a different program when the family temporarily relocated following the hurricane. Further, the arbitrator found that petitioner's other justifications did not excuse her behavior, particularly considering the student's family was back in their home during a month when petitioner continued to falsify her time sheets. The arbitrator noted that petitioner offered no explanation as to why she did not discuss the situation with her supervisor, and the arbitrator did not believe the allegations could be dismissed as "inadvertent error or even sloppy paperwork." The arbitrator acknowledged that petitioner had a clean record over her 17 years working for DOE and was herself impacted by the hurricane. Nevertheless, dismissal was justified because petitioner's behavior undermined the trust on which the Home Instruction Program is based and petitioner failed to take responsibility for her conduct and recognize how it harmed her student.
Petitioner challenged the penalty and DOE successfully cross-moved to dismiss the petition before Supreme Court (Matter of Beatty v. City of New York , 2015 N.Y. Slip Op 31254[U], 2015 WL 4400212 [Sup. Ct., NY County 2015] ). The Appellate Division, over two dissenting justices, reversed on the facts and remanded the matter to DOE for imposition of a lesser penalty as the majority determined the dismissal shocked their sense of fairness (Matter of ***1076 Beatty v. City of New York, 148 AD3d 413, 413 [1st Dept 2017] ). The majority found the misconduct to be better classified as "lax bookkeeping than implementation of any venal scheme," since petitioner instructed other students on the dates in question and would have received the same salary regardless, demonstrating that she derived no financial benefit from her actions (id. at 414). The majority also noted petitioner's unblemished 17-year record, positive testimony from her colleagues, and the mother's testimony that petitioner worked well with the child and served his needs more successfully than other teachers (id. at 414-415).
The majority exceeded its authority and did not limit its review to the proportionality of the sanction, but rather supplanted the hearing officer's judgment with the court's own assessment of the individual's misconduct and its impact on DOE's educational mission. The majority characterized the petitioner as an experienced teacher who made one mistake, which did not even result in monetary gain. In doing so, the majority improperly reweighed the evidence and ignored the arbitrator's credibility findings, in violation of our limited standard of review, which is confined to the factual record before the agency and requires deference to a hearing officer's credibility determinations ( Pell, 34 N.Y.2d at 230, 356 N.Y.S.2d 833, 313 N.E.2d 321 ; CPLR 7511 ; Matter of Nuchman v. Klein, 95 AD3d 645, 646, 946 N.Y.S.2d 113 [1st Dept 2012], lv denied 20 NY3d 855 [2013] [in proceeding pursuant to Education Law § 3020-a(5) and CPLR 7511, hearing officer's credibility findings are entitled to deference]; see also Matter of Berenhaus v. Ward, 70 N.Y.2d 436, 443, 522 N.Y.S.2d 478, 517 N.E.2d 193 [1987] [administrative hearing officer's credibility and factual findings entitled to deference] ).
Termination of employment, even for this long-term teacher, does not shock the conscience: over the course of two months, petitioner falsified daily logs and time sheets and failed to provide her student with necessary special education instruction. Both are serious violations and *1242 **263 breaches of the public trust. Moreover, the conduct had a direct effect on petitioner's student, who relied on the Home Instruction Program and was dependent on petitioner traveling to him for special education services-or at least providing instruction over email or the telephone as other Home Instruction teachers did during this period. By falsifying documents and failing to inform her supervisor that she was not visiting the student, petitioner denied this child the opportunity of a replacement teacher and some modicum of stability after the displacement caused by ***1077 the hurricane. There is no excuse for this dereliction of duty and abandonment of her special needs student. Although petitioner was working under difficult conditions after the hurricane, she had every opportunity to report the situation to her supervisor and seek assistance, but never did.
C. Matter of Williams v. City of New York
According to the evidence at the hearing, petitioner Terrell Williams was a tenured physical education and health teacher at a middle school who initiated conversations with several of his female students in the eighth grade during two school terms, inquiring if they had eligible older sisters, and if so, asked for physical descriptions and their telephone numbers. He accepted the telephone number of one student's older sister and contacted her for a date. Petitioner stated that he did not view himself as a role model for the students.
One student testified that petitioner's behavior made her feel "kind of uncomfortable" and another stated she was "kind of aggravated." The arbitrator determined the female students' testimony was consistent and that petitioner's was not credible. The arbitrator also rejected petitioner's claims that his statements were made jokingly. The arbitrator concluded dismissal was warranted because petitioner showed an inability to provide a safe and appropriate learning environment for his students by engaging in behavior that was "miles beyond any appropriate boundary between teacher and student," and that he abused his position of power "for his own benefit, without regard to the lessons he was passing on to impressionable young girls." The arbitrator noted that contrary to petitioner's "misguided" view, he was indeed a role model for his students. The arbitrator also considered petitioner's 13 years of teaching, but found them outweighed by the misconduct and his apparent lack of remorse.
Supreme Court denied the petition to vacate the part of the award that terminated employment and dismissed the proceeding. The Appellate Division, with one justice dissenting, reversed on the law and remanded the matter to DOE for imposition of a lesser penalty (Matter of Williams v. City of New York, 142 AD3d 901, 901, 38 N.Y.S.3d 528 [1st Dept 2016] ). The majority found that the penalty was so disproportionate to the offenses as to shock the conscience, primarily because while petitioner may have asked inappropriately about his students' siblings, the majority disagreed that the inquiries could be characterized as "romantic/sexual in nature" or for the purpose of "solicit [ing]
***1078 female companions for his sexual gratification," in part because there was no evidence he met with any of the students' sisters or made any sexual comments to the students. ( id. at 902, 38 N.Y.S.3d 528 ).
The Appellate Division majority improperly reweighed the evidence, and, as in Beatty, ignored the credibility determinations of the arbitrator, who did not credit petitioner's testimony and found it contradicted by the student's consistent description of the events. As the record reveals, *1243 **264 petitioner admitted the conversations occurred, although he minimized their significance or impropriety. Despite his years as a teacher, he maintained that he was not a role model for students, evincing an utter failure to appreciate his impact on his students' educational and personal development. Under these circumstances, there was substantial evidence that petitioner's actions crossed the line of a proper student-teacher relationship and demonstrated a lack of professional understanding of the potential harm inflicted on his students by seeking to date their female relatives. Significantly, petitioner's actions directly conflicted with and undermined DOE's mission by sending the message that women are measured by their physical appearance rather than their character and the strength of their ideas.* The impact of that message on females in early adolescence-delivered by a health and physical education teacher-cannot be underestimated (see Patrick Akos & Dana Heller Levitt, Promoting Healthy Body Image in Middle School, 6 Prof Sch Counseling 138-144 [2002] [middle school teachers play important role in students developing healthy body image and negative body image linked with eating disorders, low self-esteem, and depression]; see also Tanya E. Davison & Marita P. McCabe, Adolescent Body Image and Psychosocial Functioning, 146 J Soc Psychol 15-30 [2006] [poor body image may hamper development of interpersonal skills, lead to low self-esteem, and other psychosocial difficulties] ).
Although the majority acknowledged that petitioner's behavior was inexcusable, it nevertheless supplanted its own assessment of the precise penalty to be imposed for that of the ***1079 hearing officer. The majority opined that if the behavior "continue[s], termination may well be in order in the future" ( Williams, 142 AD3d at 904 ). However, the hearing officer's conclusion that termination without delay-given petitioner's conduct, which spanned two school years and involved several students-was necessary to impress upon him the seriousness of his misconduct is not irrational and does not shock the conscience or one's sense of fairness.
III. CONCLUSION
Termination of employment for the misconduct evinced in these three appeals is neither irrational nor such an affront to one's sense of fairness as to shock the conscience. This Court has repeatedly explained that under this "rigorous" standard, an administrative sanction may not be disturbed unless it is "disproportionate to the misconduct ... of the individual, or to the harm or risk of harm to the agency or ... the public" ( Pell, 34 N.Y.2d at 234, 356 N.Y.S.2d 833, 313 N.E.2d 321 ). Whether a punishment may deter future misconduct and reflects societal standards given the nature of the offense are appropriate factors for judicial consideration. A difference of opinion as to the appropriate penalty, however, "does not provide a basis for vacating the arbitral award or refashioning the penalty" ( McGraham, 17 NY3d at 920, 934 N.Y.S.2d 768, 958 N.E.2d 897 ). As in these appeals, dismissal is not a shocking response to cases in which a teacher encourages cheating, falsifies documents *1244 **265 leaving a student without educational services, or crosses the line of proper student-teacher interactions by making sexually suggestive inquiries about a student's relatives.
In Matter of Bolt v. New York City Dept. of Educ. : On review of submissions pursuant to section 500.11 of the Rules of the Court of Appeals ( 22 NYCRR 500.11 ), order reversed, with costs, cross motion by respondent New York City Department of Education to dismiss the petition granted, and certified question answered in the negative, in a memorandum.
Chief Judge DIFIORE and Judges RIVERA, STEIN, FAHEY, GARCIA, WILSON and FEINMAN concur, Judge RIVERA in a concurring opinion.
In Matter of Beatty v. City of New York : On review of submissions pursuant to section 500.11 of the Rules of the Court of Appeals ( 22 NYCRR 500.11 ), order reversed, with costs, cross motion by respondents City of New York et al. to dismiss the petition granted, and certified question answered in the negative, in a memorandums Case No. 53: On review of submissions pursuant to section 500.11 of the Rules, the arbitral award appealed from and the Appellate Division order brought up for review reversed, with costs, and judgment of Supreme Court, New York County, dismissing the proceeding reinstated, in a memorandum.
***1080 Chief Judge Differ and Judges RIVERA, STEIN, FAHEY, GARCIA, WILSON and FEINMAN concur, Judge RIVERA in a concurring opinion.
In Matter of Williams v. City of New York : On review of submissions pursuant to section 500.11 of the Rules of the Court of Appeals ( 22 NYCRR 500.11 ), the arbitral award appealed from and the Appellate Division order brought up for review reversed, with costs, and judgment of Supreme Court, New York County, dismissing the proceeding reinstated, in a memorandum.
Chief Judge DiFIORE and Judges RIVERA, STEIN, FAHEY, GARCIA, WILSON and FEINMAN concur, Judge RIVERA in a concurring memorandum.

In fact, in 2013, New York City launched the "NYC Girls Project," a multi-faceted public educational initiative supported by DOE and other agencies, and including programming at city schools and after-school programs, promoting the message that girls should be valued for their skills, beliefs, and character instead of their physical appearance (see e.g. Anemona Hartocollis, City Unveils Campaign to Improve Girls' Self-Esteem, N.Y. Times, Sept. 30, 2013, http://www.nytimes.com/2013/10/01/nyregion/ city-unveils-a-campaign-to-improve-girls-self-esteem.html [accessed Jan. 2, 2018] ).