Matter of Jacobs v Tuckahoe Hous. Auth. (2020 NY Slip Op 04392)





Matter of Jacobs v Tuckahoe Hous. Auth.


2020 NY Slip Op 04392


Decided on August 5, 2020


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on August 5, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

WILLIAM F. MASTRO, J.P.
COLLEEN D. DUFFY
BETSY BARROS
VALERIE BRATHWAITE NELSON, JJ.


2018-00887
 (Index No. 2621/17)

[*1]In the Matter of Virginia Jacobs, petitioner,
v
Tuckahoe Housing Authority, et al., respondents.


Legal Services of the Hudson Valley, Yonkers, NY (Barbara Finkelstein and Berlinda Mallebranche of counsel), for petitioner.
Mark J. Kamensky, Port Chester, NY, for respondents.



DECISION & JUDGMENT
Proceeding pursuant to CPLR article 78 to review a determination of the respondent Tuckahoe Housing Authority dated June 30, 2017, which, after a hearing, found that the petitioner had violated her lease and terminated her tenancy.
ADJUDGED that the petition is granted, on the law, without costs or disbursements, to the extent that so much of the determination as terminated the petitioner's tenancy is vacated, the petition is otherwise denied, the determination is otherwise confirmed, the proceeding is otherwise dismissed on the merits, and the matter is remitted to the respondent Tuckahoe Housing Authority for the imposition of a lesser penalty.
The petitioner has occupied an apartment at a public housing project operated by the respondent Tuckahoe Housing Authority (hereinafter THA) since October 2012. By notice dated September 26, 2016, the THA advised the petitioner that her tenancy would be terminated due to violations of her lease. Specifically, the notice alleged that the petitioner had failed to pay her rent and late fees when due during the period of October 2015 through September 2016, that on one occasion she was verbally abusive during a telephone call with a THA employee, and that on one occasion she refused to allow an exterminator entry to her apartment.
The petitioner requested a grievance hearing on the notice of termination, and an administrative hearing was conducted on May 19, 2017. The hearing evidence established that the amount of rent due changed each month in accordance with the THA's determination of the petitioner's income. The THA would determine the rental amount based upon its review of paystubs and employer letters. During the relevant period, the petitioner would receive notice of the rental amount anywhere from 10 to 22 days before that rent was due. At the time, the petitioner worked part-time at a hotel, earning $13.30 per hour, with a standard schedule of 16 hours per week.
The hearing evidence established that the petitioner was current on her rent as of September 1, 2015. Her September 2015 rent was $264, but her October 2015 rent was increased to $416. The notice informing her of this increase was dated September 21, 2015, providing her with only 10 days' notice of the need to submit the $416. The petitioner's November 2015 rent was $416, but she was informed by notice dated November 10, 2015, that her December 2015 rent would [*2]increase to $689, providing her with only 21 days' notice of the need to submit the $689. By notice dated December 16, 2015, the petitioner was informed that her January 2016 rent would decrease to $433. Her monthly rent remained at $433 until June 2016, when it was reduced to $308, where it remained through September 2016. The petitioner failed to timely pay her rent due in September and October 2015, and she was charged a $40 late fee. Although the petitioner made a $420 payment on October 28, 2015, her account remained in arrears. The THA's records show that although the petitioner made sporadic payments over the next six months, her arrears grew substantially until June 2016, at which time payments were made bringing her account current. Although the petitioner made rent payments in June and July 2016, she again failed to timely pay in August and September 2016.
On February 19, 2016, the petitioner called the THA office to report that she believed she had bedbugs in her apartment. THA employees contacted an exterminator and arranged for an inspection and for treatment in case the exterminator found bedbugs. The petitioner was notified of the inspection date and time, and was given instructions for preparing her apartment for the inspection and possible treatment, which required removing all linens and fabrics from the apartment, including those in dressers and closets, moving all of the furniture, and cleaning all of the floors. In addition, the instructions informed that the apartment must be vacant for approximately six hours after treatment. The exterminator came to the petitioner's apartment on February 22, 2016, and the petitioner had the apartment ready for the inspection. The exterminator reported finding bedbugs and treated the apartment accordingly. A second inspection was scheduled for March 14, 2016. The petitioner was notified of the second inspection by notice dated March 10, 2016. That notice informed the petitioner that the second treatment would not be performed if the apartment was not properly prepared, and that she had to call the office on March 11 so that THA employees could confirm with the exterminator that the apartment was ready. The notice further stated that if the apartment was not properly prepared for the second treatment, the extermination fee would be added to the petitioner's account. At the hearing, a THA employee testified that the exterminator went to the petitioner's apartment on March 14, but the petitioner refused treatment, stating that her cousin was sleeping in the apartment and she was not going to wake her cousin. There was no evidence regarding whether the March 11 confirmation occurred or whether the second treatment occurred on a later date. No extermination fees were added to the petitioner's account. The same THA employee testified that the petitioner's apartment was exterminated on a regular basis every other week, and there had been no problems with access on any of those occasions over the years of her tenancy.
On August 20, 2016, the petitioner used the community room at the apartment complex and failed to timely return the community room key. The THA charged her $150 for the key and retained the $50 deposit she had made in connection with using the community room. On September 12, 2016, the petitioner called the THA office to complain about the charges, asserting that she had returned the key. At some point that day, either before or after the call, THA employees discovered the key in the wrong return box. On the telephone, the petitioner was upset. Irina Matveevskii, the Executive Director of the THA, testified at the hearing that the petitioner was "very rude and loud" on the telephone, and, ultimately, the petitioner "told [her] to shut [her] mouth because [she was] not her F-ing mother and she would beat [her] up. That's where [the petitioner] [hung] up the phone." The following day, Matveevskii directed that termination proceedings be commenced against the petitioner. Two weeks later, the petitioner was notified that her tenancy would be terminated.
The petitioner testified at the hearing, inter alia, that she had not made certain rent payments because she was confused about the amount owed and was disputing certain amounts. She asserted that her rent was raised based upon paychecks that included several extra hours for training, but her regular work hours were only 16 hours per week. In addition, she testified that in October 2015, she learned of a cyst on her right ovary, which required aggressive treatment because of a family history of ovarian cancer. The removal surgery occurred in December 2015, and the petitioner was out of work for a period of time, during which she was not paid. The petitioner also testified that she would often receive notice of a rent increase after the rent was due, and she would not receive rent receipts or notifications of the outstanding balance on her account. Matveevskii confirmed that the THA was not obligated to give rent receipts and, therefore, did not. Matveevskii [*3]also confirmed that even if a tenant paid rent on time, if there was any balance outstanding, the tenant would still be charged a $40 late fee each month.
As to the exterminator, the petitioner testified that when her apartment was exterminated, she would stay away for the remainder of the day so as to avoid complications with her asthma. The petitioner admitted that she denied the exterminator access on March 14, 2016, explaining that she was not expecting him to come. Although the petitioner had signed the notice of the second extermination, she claimed that she did not read it before signing it because she thought it was a duplicate of the first notice. She also testified that at the first extermination, the exterminator told her that she did not have bedbugs, so she did not understand why a second extermination was needed.
After the hearing, the hearing officer found that the petitioner had violated certain provisions of her lease by failing to pay her rent on time, speaking in an abusive or threatening manner to THA staff, and refusing to allow an exterminator access to her apartment, and that termination of her tenancy was an appropriate penalty. The petitioner commenced this proceeding pursuant to CPLR article 78 to review the determination terminating her tenancy, arguing that the determination was not supported by substantial evidence and the penalty was disproportionate to the alleged offenses. The Supreme Court transferred the proceeding to this Court pursuant to CPLR 7804(g).
In a CPLR article 78 proceeding, judicial review of factual findings made by an administrative agency following an evidentiary hearing is limited to whether the findings are supported by substantial evidence (see CPLR 7803[4]; Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d 1044, 1045; Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 230-231). Here, the determination that the petitioner violated certain provisions of her lease is supported by substantial evidence.
An administrative penalty must be upheld unless it is so disproportionate to the offense as to be shocking to one's sense of fairness, thus constituting an abuse of discretion as a matter of law (see Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d at 237). "[A] result is shocking to one's sense of fairness if the sanction imposed is so grave in its impact on the individual subjected to it that it is disproportionate to the misconduct, incompetence, failure or turpitude of the individual, or to the harm or risk of harm to the agency or institution, or to the public generally visited or threatened by the derelictions of the individuals" (id. at 234).
Under the parties' lease, the THA may terminate the lease for "serious or repeated violations of material lease terms," including nonpayment of rent and other charges, a history of late rental payments, the failure to allow extermination treatment of the unit, and threatening or violent activity toward THA employees.
Here, although the petitioner made late rental payments during the subject period, she did eventually pay all of the rent due, as well as the fees that had accrued on the account. Moreover, the record establishes that during the subject period, the amount of the petitioner's rent fluctuated monthly, with little advance notice, such that her December 2015 rent was nearly three times as much as her September 2015 rent. The evidence submitted by the THA at the hearing also established that, as of December 8, 2015, the petitioner earned $13.30 per hour, working 16 hours per week, and the THA did not contest the petitioner's testimony that she missed some weeks of work during that time due to an ovarian-cyst-removal surgery. Under these circumstances, termination of the petitioner's tenancy is gravely disproportionate to the offense of late payments made.
Further, the two isolated incidents concerning the exterminator and the offensive telephone conversation were not proportionate to the penalty of eviction. First, although the petitioner denied the exterminator entry to her apartment on March 14, 2016, the THA's evidence [*4]otherwise established that the petitioner was the one who had requested treatment for bedbugs, she fully complied with the first treatment, and over several years of biweekly extermination for other pests, she had never denied the exterminator entry. Moreover, as to the March 14 incident, the hearing officer found that the petitioner denied entry because she had failed to complete the "necessary and extensive preparation work" for that particular extermination. The evidence establishes not that the petitioner refused treatment for the bedbugs, but simply that she was not prepared on the subject day. Notably, the THA did not allege that the petitioner refused further bedbug treatment after that date.
Second, the petitioner's single threat of violence occurred in a heated telephone conversation, immediately before the petitioner hung up in frustration and anger. The THA employee to whom the comment was directed testified at the hearing that she found the comment "[e]xtraordinary and extremely rude," but she did not testify that she was frightened or that she understood the comment to be a genuine threat of violence. While such conduct should not be tolerated, and, if repeated, could warrant termination under the terms of the lease, this was a single incident in which the affected employee was offended, but not intimidated.
The penalty imposed is so grave in its impact on the petitioner that it is disproportionate to the misconduct, or the risk of harm to the THA or the public. Under the circumstances of this case, the penalty of termination of the petitioner's tenancy is so disproportionate to the offenses committed as to be shocking to the judicial conscience as a matter of law (see Matter of Washington v Shuldiner, 150 AD3d 745, 747; Matter of Smith v Tuckahoe Hous. Auth., 111 AD3d 642, 644; Matter of Davis v New York City Dept. of Hous. Preserv. & Dev., 58 AD3d 418, 419).
Contrary to our dissenting colleague's assertion, we defer to the hearing officer's credibility and factual determinations, and conclude that substantial evidence supports the hearing officer's determination that the petitioner violated the subject provisions of the parties' lease. Regarding whether the petitioner paid the rent and late fees due as of June and July 2016, the THA's record of the petitioner's account showed payments as of June 7, 2016, covering all but $371 of the outstanding balance. At the hearing, the hearing officer concluded that the outstanding arrears had been paid in large part through the assistance of the Department of Social Services (hereinafter DSS), and that the fact that the THA record showed a balance of $371 was because of the amount of time that it took for the DSS to issue a rent check, and not because that amount remained outstanding. The hearing officer made a similar observation in the written determination. Thus, the THA's evidence and the hearing officer's determination establish that the arrears were paid as of June 2016, even though the petitioner subsequently was late or did not make her August and September 2016 payments, resulting in subsequent arrears.
Also contrary to our dissenting colleague's assertion, the fact that the petitioner elected to have her rent calculated under the "income method" rather than the "flat rent" method does not contradict the THA's evidence that the petitioner's rent fluctuated each month with little advance notice of the precise amount of the rent that would become due. We do not consider whether the rent adjustments were appropriate or erroneous, and find substantial evidence supported the hearing officer's determination that the petitioner violated the terms of the lease prohibiting repeated late rent payments. However, in considering whether termination of the petitioner's tenancy is proportionate to the misconduct of late payments, the fact that the rental amount fluctuated on a monthly basis is part of the circumstances to be considered when weighing the gravity of the petitioner's failure to timely pay the rental amount.
Finally, we note that while the dissent characterizes the hearing evidence as having established that the petitioner threatened to "beat the shit out of" Matveevskii, the sworn testimony of both witnesses for the THA who were present during the conversation did not include this additional inflammatory language. Although this language appeared in notices to the petitioner, Matveevskii did not testify that this was the language used by the petitioner or otherwise correct her testimony.
Accordingly, we remit the matter to the THA for the imposition of a lesser penalty.
MASTRO, J.P., BARROS and BRATHWAITE NELSON, JJ., concur.
DUFFY, J., concurs in part and dissents in part, and votes to confirm the determination, deny the petition, and dismiss the proceeding on the merits, with the following memorandum:
For the reasons that follow, I concur with my colleagues to the extent that they agree that the record reflects that substantial evidence supports the hearing officer's determination that the petitioner violated several provisions of her lease. However, I disagree with my colleagues to the extent that they have granted the petition in part to remit for the imposition of a lesser penalty.
The record demonstrates that the petitioner, who was chronically rent delinquent, not only threatened violence against the Executive Director of the respondent Tuckahoe Housing Authority (hereinafter the Housing Authority), the petitioner also refused to allow entry to her apartment to an exterminator for a second treatment after bedbugs had been discovered in her premises. In light of the petitioner's violations of her lease, the termination of the petitioner's tenancy imposed by the Housing Authority was not an abuse of discretion and thus I would deny the petition in its entirety and dismiss the proceeding.
At the time of the events at issue, although the petitioner had been a tenant of the public housing project for less than five years, she had a significant history of chronic rent delinquency—in fact, she had been the subject of two prior eviction proceedings for nonpayment of rent during that short time period. A third eviction proceeding had been stayed pending the outcome of the grievance proceeding.
The record also demonstrates that, with respect to the nonpayment and late payment violations that constituted one of the three charges that were the subject of the hearing, the petitioner had failed to pay rent and late fees when due during the period of October 2015 through September 2016 such that, as of September 2016, the petitioner had an unpaid balance in excess of $1,000. Specifically, the record evidences that the petitioner did not pay any rent at all for 5 out of 12 months between September 2015 and August 2016 and that, in 6 other months during that same period, she paid her rent late. Chronic rent delinquency is a sufficient basis for termination of tenancy that does not shock the conscience (see Matter of Hairston v New York City Hous. Auth., 144 AD3d 416, 417; Moise v Christian, 97 AD2d 536, 537; see also Matter of Clendon v New York City Hous. Auth., 33 AD3d 913, 914).
In this case, however, the petitioner's chronic rent delinquency was not the only basis for the hearing officer's determination to terminate the petitioner's tenancy. In addition to the petitioner's failure to pay rent, the record supports the hearing officer's determination that the petitioner was loud, profane, and verbally abusive to the Executive Director of the Housing Authority during a telephone conversation, and that the petitioner threatened to "beat the shit out of" the Executive Director. This verbal abuse and threat of violence is another basis for termination of the petitioner's tenancy. Moreover, when the petitioner was discovered to have bedbugs, although she had consented in separate writings to two extermination treatments, she refused to allow the exterminator entry to her apartment for the second treatment and inspection. During the hearing, the petitioner contended that the reason for her refusal was that she was told she did not have bedbugs, and then, alternatively, that she was not aware the exterminator was coming on the day in question. Another witness testified at the hearing that the petitioner had said she refused to admit the exterminator on the day at issue because her cousin was sleeping and she would not wake her up. The petitioner herself admitted that she was sleeping at the time the exterminator sought entry. The petitioner also testified at the hearing that she never signed a form consenting to the second extermination. When confronted at the hearing with the document which contained her signature, the petitioner then testified that she believed the second form pertained to the first treatment and that she was told by "[t]he office" that she had to sign the document.
At the conclusion of the hearing, the hearing officer sustained all three charges and [*5]found that the petitioner's testimony during the hearing had been "riddled with inconsistencies, misstatements and half-truths." The hearing officer determined that termination of the petitioner's tenancy was an appropriate penalty.
An administrative sanction must be upheld unless it shocks the judicial conscience (see CPLR 7803[3]; Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 232-234). The Court of Appeals has described this test as "rigorous" (Matter of Featherstone v Franco, 95 NY2d 550, 554), and, if the sanction imposed does not shock the judicial conscience, it must be sustained (see id. at 554). The Court of Appeals has reiterated that the appropriate standard of review is whether the administrative penalty constitutes an abuse of discretion as a matter of law (see Matter of Perez v Rhea, 20 NY3d 399, 405; see also CPLR 7803[3]; Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d at 232-234). Here, I submit, it does not.
In fact, in 2018, in Matter of Bolt v New York City Dept. of Educ. (30 NY3d 1065, 1068), the Court of Appeals emphasized that in CPLR article 78 proceedings (CPLR 7801 et seq.), a court must refrain from exceeding its authority and substituting its own judgment for that of a hearing officer. There, the Court held that a penalty should not be refashioned by an appellate court simply because "reasonable minds might disagree over what the proper penalty should have been" (Matter of Bolt v New York City Dept. of Educ., 30 NY3d at 1068 [internal quotation marks omitted]). The concurrence in Bolt "reaffirm[ed] the high degree of impropriety and affront to our sense of fairness required to shock the conscience" (id. at 1069 [Rivera, J., concurring] [internal quotation marks omitted]).
Here, my colleagues in the majority have substituted their own judgment for that of the hearing officer as to an appropriate penalty and have also abrogated the fact-finding determinations of the hearing officer. As an initial matter, the majority's contention that the petitioner "did eventually pay all of the rent due, as well as the fees that had accrued on the account" (majority op at 4) is not supported by the record—indeed, the contrary is true. In her decision after the hearing, the hearing officer noted that, as of September 2016, there was a balance in excess of $1,000 that the petitioner owed. Also, during the May 2017 hearing, the hearing officer noted that, even excluding unpaid amounts that were the subject of an eviction proceeding in court, the rental payment records for the petitioner demonstrated that $371 remained unpaid. Likewise, the majority's contention that the petitioner's threat of violence occurred "in a heated telephone conversation" (majority op at 5) erroneously intimates that the Housing Authority Executive Director somehow participated with the petitioner in a heated telephone exchange. In fact, the Housing Authority Executive Director testified that the petitioner "did not let me speak at all," and that when she tried to say something, the petitioner "told [her] to shut [her] mouth because [she is] not her F-ing mother and she would beat [her] up" and that the petitioner then hung up the phone. The Executive Director's testimony about what had transpired during the telephone call was corroborated in the record by a sworn statement of a Housing Authority employee who overheard the petitioner on the phone. The characterization by the majority minimizes the petitioner's behavior as well as the hearing officer's determination that the petitioner engaged in "a loud, threatening, profane and abusive manner."
The majority also takes issue with the hearing officer's finding that the petitioner threatened "to beat the shit" out of the Executive Director, even though the record is replete with evidence of that statement, including the testimony of the Executive Director herself, who confirmed during the hearing that she directed her staff to send a letter to the petitioner which recites the exact language used by the petitioner when she threatened the Executive Director.
Additionally, the majority points to the petitioner's chronic rent delinquency by contending that the amount of the petitioner's rent fluctuated monthly, with little advance notice. However, this contention is belied by the express terms of the lease between the parties regarding the calculation of the petitioner's rent based upon the increase or decrease of the petitioner's income [*6]and the methods by which the petitioner was to be notified of any such increases or decreases. In fact, the lease sets forth the methods of calculation of the income and provides the petitioner with the option of choosing either a flat monthly rent amount or an income method rent in which the petitioner was required to report income to the Housing Authority on a quarterly basis and the rent would be adjusted according to that income. The lease also provides mechanisms of relief for a tenant who believes that the rent calculation was inconsistent with the actual income for that same period. Although the specific amount of an increase or decrease in rent may not have been known by the petitioner, since the lease provides that the income method rent versus flat rent option is by choice of the petitioner, the petitioner should have been aware of how her rent was calculated from the time that she entered into the lease. And, although the majority points out that the petitioner's December 2015 rent was almost three times as much as her September 2015 rent, the hearing officer noted that the petitioner "reported significantly increased earnings in November and December 2015." Thus, pursuant to the terms of the lease, an increase in the December rent versus the September rent was appropriate and should have been anticipated by the petitioner. Indeed, there is no evidence in the record that the rent adjustments—upward or downward—were inappropriate or erroneous.
Notably, the facts as determined by the hearing officer deviate significantly from those cases wherein this Court has found that the penalty of termination has shocked the conscience (see e.g. Matter of Washington v Shuldiner, 150 AD3d 745, 747 [termination too harsh where petitioner's belligerence did not involve violence or threats of violence and arose out of mental health problems, and violation was failure to pay fees related to additional appliances in petitioner's apartment]; Matter of Smith v Tuckahoe Hous. Auth., 111 AD3d 642, 644 [termination of tenancy too harsh where tenant, who had verbal confrontations with housing authority employees, had lived in premises for 25 years without complaint, none of the incidents involved violence, tenant's wife was not involved in any of the incidents, and tenant acknowledged he had "anger issues" and participated in anger management therapy]; Matter of Alexander v Rhea, 90 AD3d 1041, 1042 [termination of tenancy too harsh based on alleged violations of federal regulations which provide that members of an assisted family may not receive Section 8 assistance while receiving similar benefits under another assistance program; although tenant was listed as head of her household as well as that of her mother's household where the mother, until her death, lived in another apartment with tenant's two disabled brothers, tenant received no benefit from subsidy to her mother's household]). These cases illustrate that correction or amelioration of the circumstances underlying the violation at issue has been an important factor in determining that a penalty may be too harsh. The long duration of a tenancy and the impact on other innocent family members who reside in the premises are also mitigating factors that have been considered in the cases cited above. None of those circumstances exist here. In this case, as of the dates of the events at issue, the petitioner had resided alone in the premises for less than five years, her chronic rent delinquency had not abated, and she failed to acknowledge any responsibility for the other violations.
Although the majority points to certain contentions of the petitioner as mitigation and a basis for its determination that termination of her tenancy shocks the conscience, our review is confined to the factual record before the hearing officer and requires deference to the hearing officer's credibility determinations (see Matter of Bolt v New York City Dept. of Educ., 30 NY3d at 1076 [Rivera, J., concurring], citing Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d at 230). Here, the petitioner's explanation for her failure to pay rent, her version of her altercation with the Housing Authority Executive Director, and her reasons for refusing entry to the exterminator were all soundly rejected by the hearing officer, who found the petitioner's testimony to be filled with inconsistencies, misstatements, and half-truths.
Accordingly, under the circumstances of this case, given the petitioner's chronic rent delinquency, coupled with her threat of violence against the Housing Authority Executive Director, and compounded by the petitioner's refusal to allow an exterminator entry into her apartment and her evident unwillingness to take responsibility for such violations, the penalty imposed does not constitute an abuse of discretion and thus should not be disturbed.
ENTER:
Aprilanne Agostino
Clerk of the Court