People v Shabazz (2022 NY Slip Op 06834)

People v Shabazz

2022 NY Slip Op 06834

Decided on December 1, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:December 1, 2022

110654 113175
[*1]The People of the State of New York, Respondent,
v
Malik Shabazz, Appellant.

Calendar Date:October 19, 2022

Before:Egan Jr., J.P., Clark, Pritzker, Reynolds Fitzgerald and Ceresia, JJ.

Paul J. Connolly, Delmar, for appellant, and appellant pro se.
P. David Soares, District Attorney, Albany (Vincent Stark of counsel), for respondent.

Clark, J.
Appeals (1) from a judgment of the County Court of Albany County (Peter A. Lynch, J.), rendered July 11, 2018, upon a verdict convicting defendant of the crimes of robbery in the first degree (two counts), robbery in the second degree and burglary in the first degree (two counts), (2) from a judgment of said court, rendered September 28, 2018, which resentenced defendant, and (3) by permission, from an order of the Supreme Court (Roger D. McDonough, J.), entered October 20, 2021 in Albany County, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, without a hearing.
On January 17, 2017, three men forcibly entered the apartment of victim A and his girlfriend, victim B. According to the victims, one of the men held them at gunpoint while the other two searched the apartment. After a few minutes, the three men escaped with a few hundred dollars and some collectible coins and bills that were out of circulation. The victims later identified defendant as one of the perpetrators and, following a trial, defendant was convicted of two counts of robbery in the first degree, robbery in the second degree and two counts of burglary in the first degree. County Court denied defendant's motion to set aside the verdict and sentenced him, as a second felony offender, to the maximum term of imprisonment for each of his convictions, to be served concurrently, totaling 25 years in prison to be followed by five years of postrelease supervision. After the original sentence imposed on one of the convictions for burglary in the first degree was discovered to be illegal, the court resentenced defendant on that charge to a concurrent term of 25 years in prison to be followed by five years of postrelease supervision. Supreme Court thereafter denied defendant's CPL 440.10 motion without a hearing. Defendant appeals from the judgments of conviction and, by permission, from the order denying his CPL 440.10 motion.
Defendant contends that the verdict is based on evidence that is legally insufficient and the verdict is against the weight of the evidence because the People did not establish his identity as one of the perpetrators. Initially, because defendant failed to renew his motion for a trial order of dismissal following the close of all proof, his challenge to the sufficiency of the evidence is unpreserved (see People v Roberts, 203 AD3d 1465, 1466 [3d Dept 2022]; People v Mesko, 150 AD3d 1412, 1412 [3d Dept 2017], lv denied 29 NY3d 1131 [2017]). "Nevertheless, in the course of reviewing [a] defendant's challenge that the verdict as to all counts is against the weight of the evidence, we necessarily evaluate whether all elements of the charged crimes were proven beyond a reasonable doubt" (People v Stover, 178 AD3d 1138, 1139 n 1 [3d Dept 2019] [internal quotation marks and citation omitted], lv denied 34 NY3d 1163 [2020]; see People v Race, 78 AD3d 1217, 1219 [3d Dept 2010], lv denied 16 NY3d 835 [2011]). "In conducting a weight [*2]of the evidence review, we must view the evidence in a neutral light and determine first whether a different verdict would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Barzee, 190 AD3d 1016, 1017-1018 [3d Dept 2021] [internal quotation marks and citations omitted], lv denied 36 NY3d 1094 [2021]; see People v Martinez, 166 AD3d 1292, 1293 [3d Dept 2018], lv denied 32 NY3d 1207 [2019]).
As relevant here, "[a] person is guilty of robbery in the first degree when he [or she] forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he [or she] or another participant in the crime . . . [i]s armed with a deadly weapon" or "[d]isplays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm" (Penal Law § 160.15 [2], [4]). "A person is guilty of robbery in the second degree when he [or she] forcibly steals property and . . . is aided by another person actually present" (Penal Law § 160.10 [1]). "A person is guilty of burglary in the first degree when he [or she] knowingly enters or remains unlawfully in a dwelling with intent to commit a crime therein, and when, in effecting entry or while in the dwelling or in immediate flight therefrom, he [or she] or another participant in the crime . . . [i]s armed with . . . a deadly weapon" or "[d]isplays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm" (Penal Law § 140.30 [1], [4]). "Finally, as an implicit but necessary element of each and every crime, the People must prove beyond a reasonable doubt the identity of the defendant as the person who committed the crime" (People v Taylor, 196 AD3d 851, 853 [3d Dept 2021] [internal quotation marks, brackets, ellipsis and citations omitted], lv denied 37 NY3d 1030 [2021]; see People v Davis, 200 AD3d 1200, 1201 [3d Dept 2021]; People v Green, 194 AD3d 1106, 1108 [3d Dept 2021]).
Victim A testified that on January 17, 2017, he arrived home from work between 4:30 p.m. and 5:00 p.m. and smoked some marihuana, as he did daily. According to victim A, victim B arrived around 7:00 p.m. After eating dinner together, the two watched television until around 10:00 p.m., when victim A went to bed while victim B stayed up. According to victim A, victim B woke him up screaming that someone was trying to get into the home, causing him to jump out of bed and approach the front door. Victim A approached the door, and both victims said that they heard someone yell "police" from the other side of the door. As victim A began to open the door, three men forced their way through the doorway, and the first man pistol-whipped victim A on the head. According to both victims, the first man brandished a weapon and wore a mask covering his face; the second man [*3]carried no gun and wore a hooded sweatshirt with the hood tightened such that only his eyes and the top of his nose were visible; and the third man carried a revolver and wore a hooded jacket with the hood sitting on his head, leaving his face uncovered.
As the three men entered the apartment, they directed both victims to get on the ground. Victim A positioned himself between victim B and the third man, who kept his gun aimed at victim B. While the third man held the victims at gunpoint, the masked man and the hooded man ransacked the apartment. During this time, both victims observed a neighbor peek through the front door but signaled the neighbor to leave to avoid putting him in danger. The neighbor, who did not get a good look at the perpetrators, returned to his apartment and his wife called the police.
Victim A asserted that as the hood around the hooded man's face began to loosen, he recognized him as Luis DeJesus. Victim A worked with DeJesus's brother, and he met DeJesus a few months before the break-in. Victim A, who admitted to having a criminal record, explained that in the weeks leading up to January 17, 2017, he had sold marihuana to DeJesus three or four times, and during each of those times, the two smoked marihuana together. As a result of those interactions, victim A had obtained DeJesus's phone number.
Victim A stated that although the three men were presumably looking for marihuana, they only found and took a few hundred dollars in cash as well as some collectible currency in the form of antique coins (some of which were kept in a red Ziploc bag) and misprinted bills before escaping. Victim A attempted to follow the men but thought better of it when the masked man shot in his direction. Soon after victim A returned to the apartment, police arrived on the scene. Victim A provided Timothy Haggerty, a detective with the Albany Police Department, DeJesus's name, phone number and a photograph from DeJesus's Facebook page. After the police left, victim A went to the hospital to get his head injury assessed. According to victim A, a few days later, victim B found defendant's picture through DeJesus's Facebook page, and they both identified him as the unmasked man who broke into their apartment. Victim A also testified that, several weeks later, Haggerty and his partner presented him with a photo array, through which he identified defendant as the unmasked man.
Victim B testified that she got a very good look at the unmasked man's face during the incident. She explained that, as he pointed a gun at her, she maintained eye contact with him in an attempt to appeal to his humanity. Victim B stated that, in the days following the break-in, she began looking through Facebook and multiple pages that depicted DeJesus. A few days later, she came across defendant's profile picture and recognized him as the unmasked man. Victim B took a screenshot of the profile picture, which image was admitted into evidence at trial and showed that it [*4]was taken on January 22, 2017. Victim B asserted that she shared this information with the police a few days later. Thereafter, victim B stated that, on the night of July 4, 2017, she saw defendant's picture on the news and she again recognized him as the unmasked man who broke into her home. The next day, she called the District Attorney's office, who connected her with Haggerty.
Haggerty testified that, upon arriving at the victims' home on the night of January 17, 2017, he observed that victim A had an injury on his head but found him to be coherent. Haggerty said that as he began to obtain a description of the three men, victim A quickly identified DeJesus and shared his phone number and a picture, causing Haggerty to focus his attention on DeJesus. On January 19, 2017, Haggerty arrested DeJesus and recovered certain misprinted bills from his person. Haggerty described that a search of DeJesus's home turned up, among other things, a red Ziploc bag containing many antique coins. As part of the warrant, Haggarty also sought DeJesus's phone records, which took a few weeks to receive. Upon obtaining the phone records, Haggarty noticed that, in the hours leading up to the break-in, DeJesus exchanged 11 phone calls with a single telephone number, which a Facebook search connected to defendant.
On April 25, 2017, Haggerty prepared a photo array, and victim A selected defendant's picture, stating that "[h]e looks like the guy that came into my house and robbed me and my girlfriend." In the months that followed, Haggerty conducted surveillance outside a home where he believed defendant resided in the City of Troy, Rensselaer County but he was unsuccessful in speaking with defendant. Then, in early July 2017, Haggerty spoke with victim B, who reported seeing defendant on the news and identified him as the unmasked man who broke into her home on January 17, 2017. Soon after, defendant was arrested, and a search of his home and vehicle turned up no physical evidence. Haggerty also obtained a search warrant for defendant's cell phone records.
Andrew Munson, a senior crime analyst with the Capital Region Crime Analysis Center, testified that he was provided with the cell phone records for DeJesus and defendant, which included the coordinates (in longitude and latitude) of the cell towers that connected each of the calls, texts, and data signals to and from the cell phones owned by DeJesus or defendant, respectively. Munson used those cell tower coordinates to interpose the cell towers on a map of the relevant area, thereby creating a visual representation of the approximate locations of DeJesus and defendant on the night of January 17, 2017. These cell tower maps show DeJesus's and defendant's phones accessing cell towers near the victims' home from 10:30 p.m. until about 11:30 p.m., another tower in Troy around 11:45 p.m., and then towers near DeJesus's home in the City of Cohoes, Albany County shortly after midnight.
Defendant presented the testimony [*5]of Michael Leippe, an experimental psychologist, who explained his research and expertise in the area of eyewitness identification. Leippe explained that many factors can influence eyewitness identification and memory, including the involvement of a weapon in the crime, cross-racial identifications, the number of perpetrators, positive feedback on prior identifications and any postevent information. Leippe admitted that his testimony corresponded to research, and that he had never met or talked to the victims in this case. In the end, he stated, there was no way to know whether the eyewitness identifications here were accurate.
For his part, defendant testified and denied involvement in the crimes, asserting that he had never been to the victims' home. Defendant stated that he often hung out at a nearby barbershop, sometimes past 11:00 p.m., but he was unable to provide a name or an address for the shop. Although while testifying defendant initially denied knowing DeJesus, he then admitted that the two would have drinks occasionally and sometimes spoke on the phone.
The evidence proffered to identify defendant as one of the perpetrators was comprised of the testimony of victim A and victim B, defendant's phone calls with DeJesus and the cell tower locations accessed by defendant and DeJesus, indicating that the men were together on the night of the break-in. Had the jury questioned the credibility of the victims' identification or discredited the cell tower locations as inexact, a different verdict would not have been unreasonable (see People v Ashe, 208 AD3d 1500, 1504-1505 [3d Dept 2022]; People v Slivienski, 204 AD3d 1228, 1235 [3d Dept 2022], lv denied 38 NY3d 1136 [2022]). However, viewing the evidence in a neutral light, weighing the probative force of the conflicting testimony and considering the relative strength of the inferences to be drawn therefrom, while deferring to the jury's credibility determinations, we are satisfied that defendant's convictions for both counts of robbery in the first degree, robbery in the second degree and both counts of burglary in the first degree are not against the weight of the evidence (see People v Smith, 174 AD3d 1039, 1043 [3d Dept 2019], lv denied 35 NY3d 1097 [2020]; People v Brabham, 126 AD3d 1040, 1043 [3d Dept 2015], lv denied 25 NY3d 1160 [2015]; People v Toye, 107 AD3d 1149, 1151 [3d Dept 2013], lv denied 22 NY3d 1091 [2014]; People v Elwood, 80 AD3d 988, 990 [3d Dept 2011], lv denied 16 NY3d 858 [2011]).
Defendant argues that County Court erred in denying his motion to suppress the photo array because the procedure was unduly suggestive. "A photo array is unduly suggestive if some characteristic of one picture draws the viewer's attention in such a way as to indicate that the police have made a particular selection" (People v Muniz, 93 AD3d 871, 872 [3d Dept 2012] [internal quotation marks and citations omitted], lv denied 19 NY3d 965 [2012]); see People v Linear, 200 AD3d 1498, 1499 [3d [*6]Dept 2021], lv denied 38 NY3d 951 [2022]). The array used here depicts individuals of similar age, appearance and physical characteristics. Haggerty, who prepared the array, testified at the Wade hearing that he presented the array to victim A, who at the time was alone in his home.[FN1] Defendant's contention that his photo showed slightly more of his shirt than the other photos depicted does not render the array unduly suggestive, as the clothing that defendant wore in the array was not evocative of the clothing described by the victims (see People v Bowman, 194 AD3d 1123, 1126 [3d Dept 2021], lv denied 37 NY3d 963 [2021]; People v Serrano, 173 AD3d 1484, 1487 [3d Dept 2019], lv denied 34 NY3d 937 [2019]; People v Muniz, 93 AD3d at 873).
Next, we turn to defendant's contention that County Court abused its discretion when it denied his request for an adjournment of the trial after the People turned over the cell tower maps a few days before the trial commenced. A review of the record reveals that the cell tower maps were not new evidence; rather, as Munson explained at trial, these maps simply presented the written coordinates obtained from the cell phone records of DeJesus and defendant — evidence that defendant received long before trial — in a visual way. Regardless, the People turned the maps over the same day that they were created, thereby complying with the plain language of CPL former 240.60. As a result, it cannot be said that County Court abused its discretion in denying defendant's adjournment request (see People v Salas, 23 AD3d 414, 414 [3d Dept 2005], lv denied 6 NY3d 818 [2006]; compare People v Adrian, 209 AD3d 1116, ___, 2022 NY Slip Op 05896, *3 [3d Dept 2022]).
Furthermore, defendant contends that defense counsel was ineffective in a number of ways. We disagree. Defense counsel was not ineffective for failing to object to defendant being shackled during the grand jury proceedings because, under the law in place at the time of said proceedings, "the prosecutor's cautionary instructions to the grand jury were sufficient to dispel any potential prejudice" (People v Muniz, 93 AD3d at 872; see People v Morales, 132 AD3d 1410, 1410 [4th Dept 2015], lv denied 27 NY3d 1072 [2016]).[FN2] Defense counsel was likewise not ineffective for declining to object to the admission of the photo array at trial, especially since counsel used victim A's statement following the photo array to cast doubt on the identification of defendant during cross-examination (see People v LaDuke, 140 AD3d 1467, 1471 [3d Dept 2016]; People v Morris, 101 AD3d 1165, 1166 [3d Dept 2012], lv denied 20 NY3d 1102 [2013]). While we acknowledge that defense counsel erred during summation by stating that it could not be known when victim B took a screenshot of defendant's Facebook photo (despite the image depicting that it was taken on January 22, 2017), we find that such isolated error is not "so grievous as to amount to a deprivation of the constitutional right to a fair trial[*7]" (People v Brabham, 126 AD3d at 1043). Defendant's remaining claims regarding ineffective assistance — that defense counsel erred by failing to request limiting instructions regarding the photo array, and by failing to object to certain comments made by the prosecution — lack merit.
In addition, the record reveals that defense counsel had a strategy aimed at casting doubt on the identification evidence. To that end, counsel proffered the testimony of Leippe to controvert victim B's cross-racial identification of defendant and the victims' identification of defendant while they were held at gunpoint. Counsel highlighted victim A's statement following his viewing of the photo array — that defendant "look[ed] like" one of the perpetrators — as well as victim A's marihuana use and criminal record. Having viewed counsel's performance in its totality, we find that counsel pursued a rational defense, presented expert testimony to support the defense theory and vigorously cross-examined the People's witnesses. Therefore, we conclude that defendant received meaningful representation (see People v Green, 208 AD3d 1539, 1546 [3d Dept 2022]; People v Agan, 207 AD3d 861, 870 [3d Dept 2022], lvs denied 38 NY3d 1186, ___ NY3d ___ [Oct. 31, 2022]).
We likewise reject defendant's additional claims of ineffective assistance, presented through his CPL 440.10 motion. Defendant contends that Supreme Court erred in denying his motion to vacate his conviction, without a hearing, because he established that defense counsel was ineffective when she failed to pursue an alibi defense and to present evidence regarding defendant's mobility issues. Notably, defendant's proposed alibi defense was directly contradicted by his phone records, and defendant's own medical records contradict defendant's claim that he found it "extremely difficult to walk and impossible to run." In the end, defendant's assertions that he informed counsel about these potential defenses amount to self-serving claims and are insufficient to merit a hearing (see People v See, 206 AD3d 1153, 1155-1156 [3d Dept 2022]; People v Newhall, 206 AD3d 1144, 1152-1153 [3d Dept 2022], lv denied ___ NY3d ___ [Oct. 28, 2022]).
We also reject defendant's claim that his sentence is harsh and excessive. Although defendant received the maximum sentence, the trial evidence established that defendant and his accomplices broke into the victims' home, ransacked it, injured victim A, stole items and held the victims at gunpoint throughout the ordeal. At sentencing, victim B explained the lasting traumatic effects she suffers as a result of defendant's conduct and the entire incident. Under these circumstances, and in light of defendant's prior criminal history, we do not find any basis to disturb the lawful sentence imposed by County Court (see People v Anthony, 152 AD3d 1048, 1054 [3d Dept 2017], lv denied 30 NY3d 978 [2017]; compare People v Kerrick, 206 AD3d 1268, 1271 [3d Dept 2022], lv denied 38 NY3d 1151 [2022]).
Defendant's remaining arguments, including those raised in defendant's pro se submission, to the extent not specifically addressed herein, lack merit.
Egan Jr., J.P., Pritzker, Reynolds Fitzgerald and Ceresia, JJ., concur.
ORDERED that the judgments and the order are affirmed.

Footnotes

Footnote 1: Although, at the time of trial, photo arrays were required to be conducted using a double-blind procedure (see CPL 60.25 [c]), such a procedure was not required at the time that the photo array was conducted.

Footnote 2: Where the prosecutor fails to "articulate a reasonable basis on the record" for the use of such restraints "at the commencement of the proceeding, outside the presence of the grand jury" (People v Cain, 209 AD3d 124, 126 [3d Dept 2022]), we undertake a review of the grand jury minutes to determine whether there were cautionary instructions sufficient to dispel any potential prejudice (see People v Alsaifullah, 162 AD3d 1483, 1485 [4th Dept 2018], lv denied 32 NY3d 1062 [2018]; People v Brooks, 140 AD3d 1780, 1781 [4th Dept 2016], lv denied 32 NY3d 1124 [2018]; People v Muniz, 93 AD3d at 872) or whether the evidence presented at grand jury was so overwhelming that it eliminated the potential for prejudice (see People v Young, 153 AD3d 1618, 1621 [4th Dept 2017], lv denied 30 NY3d 1065 [2017] and cert denied ___ US ___, 139 S Ct 84 [2018]; People v Richardson, 143 AD3d 1252, 1253 [4th Dept 2016], lv denied 28 NY3d 1150 [2017]). Although we need not consider the evidence posed before the grand jury, as an appropriate instruction was given, our review of the grand jury minutes reveals that the evidence presented was overwhelming.